IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

DONALD SHRABLE                                                    PLAINTIFF

v.                              CASE NO. 4:10cv02066 JTK

EATON CORPORATION                                               DEFENDANT

MEMORANDUM AND ORDER

   This matter is before the Court on Defendant's Motion for Summary Judgement (Doc.
No. 19).  Plaintiff filed a Response to the motion (Doc. No. 26), and Defendant filed a Reply
(Doc. No. 31).  For the reasons explained below, the Motion for Summary Judgment is granted.

I.  Procedural History

   Plaintiff, Donald Shrable, filed a Complaint in the Sixth Division of the Pulaski County
Circuit Court of Arkansas on October 20, 2010, alleging age and disability discrimination as well
as harassment and retaliation (Doc. No. 2).  Particularly, Plaintiff contends violations of the
Employee Retirement Income Security Act of 1974 ("ERISA"), the Fair Labor Standards Act
("FLSA"), the Family and Medical Leave Act ("FMLA"), the Americans with Disabilities Act
("ADA"), the Arkansas Civil Rights Act of 1993 ("ACRA"), and presumably the Age
Discrimination in Employment Act ("ADEA").  Defendant filed a Notice of Removal on
December 29, 2010, on the grounds of federal question and diversity of citizenship (Doc. No.
1).  Defendant thereafter filed an Answer to the Complaint (Doc. No. 5), and the parties
consented to the jurisdiction of a United States Magistrate Judge on March 15, 2011 (Doc. No.
11).  Plaintiff filed his Amended Complaint with a jury demand on July 26, 2011 (Doc. No. 17),

and Defendant submitted its Answer to the Amended Complaint on July 27, 2011 (Doc. No. 18).  Subsequently on December 2, 2011, Defendant filed the summary judgment motion now before the Court.

## II.  Factual Background

Eaton Corporation ("Eaton") has a facility in Mountain Home, Arkansas, that manufactures hoses that are used in the hydraulic, aerospace, and automotive industries (Doc. Nos. 21, 27, p. 1).  Plaintiff, Donald Shrable, worked for Eaton at its Mountain Home facility. *Id.*  He was the most senior hourly employee in the plant, and his job entailed running a brand strip machine.[1]  The brand strip operator position allowed Plaintiff to move freely about the plant.  When changes occurred in July 2008, Plaintiff as the senior most hourly employee was allowed to bid first on another position, and he chose to become a "floating" extruder operator, which required him to operate an extruding machine when the regular operators were on break, lunch, vacation, or otherwise unavailable.  *Id.* at 2-3.

The parties agree that, as of early 2007, the Mountain Home facility was a "problem facility," where it was not uncommon for management to "literally be cursed at when they made reasonable requests to hourly employees." *Id.*  Eaton's Mountain Home facility had one of the worst safety records in the company, a poor record of on-time deliveries, and low employee morale.  When the new plant manager, Jim Gardner, arrived at the facility, it was his desire to

---

[1]Eaton submits that Plaintiff was the only brand strip machine operator at the facility; however, Plaintiff disputes this fact and claims that there were others that operated the machine but that he was the "collective brand strip operator."  (Doc. Nos. 21, 27, at 2).  The job entailed printing "strips that contained regulatory information about the hose, the air pressure capacity of the hose ..., and the calendar quarter in which the hose was manufactured. *Id.*

turn things around by encouraging cooperation and teamwork among the employees and management team. Therefore, the management team adopted policies and practices to encourage a better working relationship and to ensure a more standardized production process (Doc. No. 21, p. 2; Doc. No. 27, p. 2). Plaintiff notes however that, while Gardner and his management team may have sought to improve conditions at the facility, things at the Mountain Home facility did not change (Doc. No 27, p. 2).

Plaintiff was terminated on June 30, 2009 (Doc. No. 21-1, p. 9). He admits that he received his first-level written disciplinary in late September 2008 (Doc. No. 27, p. 3), that he was "talked to" about incidents on April 11, 2008; May 4, 2008; and June 14, 2008, and that a fourth offense ordinarily leads to termination (Doc. No. 27, p. 4). While the September 2008 offense would have led to Plaintiff's termination, management could not determine whether Plaintiff had ever been formally counseled about these prior incidents; therefore, the first-level written discipline was issued. *Id.* Also in the late fall of 2008, during a meeting with production supervisors, there were complaints that the floaters were spending too much time wandering the facility and socializing. Production manager, Ed Just, instructed the supervisors to assign the floaters to specific machines if they felt it would minimize on fraternizing (Doc. Nos. 21, 27, p. 4). According to Plaintiff, his supervisor, P.J. Shrable, assigned him to a specific extruder machine at Just's direction because Plaintiff was wandering the facility too much. *Id.* Plaintiff confronted Just sometime in December 2008, when Just informed Plaintiff that he made a general suggestion that floaters who were wandering too much be assigned to a machine but that he was not specifically referring to Plaintiff. *Id.* at 4-5. Plaintiff told Just that, if he had a

3

problem with anything he was doing, he hoped Just would come to him directly.  Just told

Plaintiff that he would.  Approximately two hours after this conversation, Just found Plaintiff

on the floor talking with another employee and away from his machine.  Just approached

Plaintiff and essentially told him he was not doing his job because his machine was not running.

Plaintiff returned to his machine.[2]  *Id.* at 5.  Also in the fall of 2008, Eaton's business was

affected by a sharp economic decline (Doc. Nos. 21, 27, p. 5).  Although in years past,

production employees received gift cards at Christmas and were allowed an extra half hour of

paid lunch time near Thanksgiving and Christmas, Eaton's corporate headquarters announced

these benefits would be eliminated for the 2008 holiday.  Id.  Employees were unhappy about

the change, but it was made corporate-wide.

In January 2009, the Mountain Home facility created empowered work team meetings[3]

wherein employees were given time and resources to improve things on the shop floor.  Before

the meetings were held, employees received four weeks of training on problem-solving,

constructive communication, and "teaming" skills (Doc. No. 21, p. 6).  Cyndi Witherby, the

supply chain manager who also served as a manager mentor, and Jay Curtis, an engineer,

facilitated the first meeting that took place on January 6, 2009, and they thereafter informed Just

---

[2]Plaintiff states another younger employee was also away from his machine but that Just did
not approach him (Doc. No. 27, p. 5).

[3]Just stated in his deposition that the empowered work team meeting was a new approach
Eaton Corporation was taking at the plant for continuous improvement activities.  He stated that the
employees had "an hour and 15 minutes every week" in a classroom environment to acquire the
necessary tools to improve their work areas.  The January 2009 meeting, according to Just, "had a
charter, had a scope ... [and it] was very clear that the meeting was intended to improve things that ...
that were, one, within their control but, two, had a direct impact on their ability to do their jobs."
(Doc. No. 26-2, p. 15).

that Plaintiff and some co-workers challenged them, with Plaintiff specifically asking whether employees were going to get their gift cards and extra lunch time in 2009. *Id. See also* Doc. Nos. 26-1, p. 12; 26-2, p. 14. According to Eaton, Plaintiff stated in a sarcastic tone something to the effect of, "Don't you think this is why we have bad attitudes?"[4] *Id.* Plaintiff also recalls that he brought up a change made to the company's 401K plan and the elimination of the sick leave policy (Doc. No. 27, p. 6). Eaton denies this, however, because it states that the communication about the 401K plan was not issued until late February 2009 (Doc. No. 21, pp. 6-7). Plaintiff received a written warning for his conduct during the meeting (Doc. Nos. 21, 27, p. 7). On January 12, 2009, it was discovered that on December 19, 2008, Plaintiff had used the wrong mandrel,[5] causing the entire reel of hose to have pin-holes and a split cover. *Id.* P.J. Shrable, Plaintiff's supervisor, asked him about it, to which Plaintiff responded that "he just missed it." *Id.* On January 21, 2009, Plaintiff was placed on a Performance Improvement Plan[6] and received written notification of what was expected of him, including that he stay at his work station and focus on his job, follow the standard work and perform all prescribed quality checks, and constructively participate in team problem solving (Doc. No. 21-1, Exhibit D). Plaintiff was advised that failure to follow the plan would result in his termination.

---

[4]Also during this team meeting, two employees were verbally abusive to another employee, calling him a "dumb bastard," ridiculing his ideas and calling him a "suck up." One of the employees was fired and another received a written warning for his behavior (Doc. Nos. 21, 27, p. 7).

[5]The mandrel is the part that makes the hose hollow (Doc. No. 21, p. 7).

[6]The plan's title states it is a "Process Improvement Plan," but the body of the document and the parties refer to the plan as a "Performance Improvement Plan."

In February and April of 2009, the Mountain Home facility had a reduction in force (RIF), and it announced in February that the 401K matching would be suspended until further notice (Doc. No. 21, p. 8). All production employees were required to take one week's unpaid leave per calendar quarter, and other employees were asked if they would be interested in volunteering for an unpaid leave of absence to prevent further reductions. Approximately 100 employees, including Plaintiff, volunteered for such leave. *Id.* By this time P.J. Shrable was no longer Plaintiff's supervisor; his supervisor was Matteo Blanc, an engineer who was in management training. *Id.*

Plaintiff admits that Blanc knew nothing of his prior disciplinary history (Doc. No. 27, p. 8). Upon his return for the voluntary unpaid leave, Blanc had issues with Plaintiff's frequent time away from his post and he talked to Plaintiff about it (Doc. No. 21, p. 9). After discussion with other supervisors, Blanc reassigned Plaintiff to a mandrel machine in hopes that he would stay put and be more attentive to his duties[7] (Doc. Nos. 21, 27, p. 9). Plaintiff volunteered for another leave, and upon his return in June 2009, Blanc continued to observe problems with Plaintiff's attentiveness, his staying on the job, and his quality and productivity of work. Eaton states Blanc continued to counsel Plaintiff informally, but Plaintiff denies this. *Id.* at 9-10.

On or about June 25, 2009, an Eaton employee left early, and Blanc assigned Plaintiff to work that employee's machine. Blanc went to speak with Plaintiff at his assigned work station, and Plaintiff was not there. The machine was not running, and Plaintiff did not leave his

---

[7]Eaton states Blanc asked Plaintiff where he thought he should work and that Plaintiff suggested the mandrel machine. Plaintiff denies this. *See* Doc. Nos. 21, 27, p. 9.

location on the machine's message board.[8] Plaintiff asserts that he went to the restroom because the machine had just finished a run and was down for re-tooling (Doc. No. 27, p. 10). Eaton states it was Plaintiff's normal practice not to indicate where he was, but Plaintiff contends that, given that the machines had to be warmed up and retooled, he helped other employees, which had never been a problem until he complained (Doc. Nos. 21, 27, p. 10). Blanc found Plaintiff on break, and he talked to Plaintiff and left the area. Shortly thereafter, Blanc returned to speak with Plaintiff again, and Plaintiff was not at his machine and nothing was on his machine's board. Nor was his machine running. Blanc saw Plaintiff coming out of the break room and asked him if he had taken two breaks, to which Plaintiff responded, "I try not to." *Id.* Plaintiff denies taking two rest breaks but admits his machine had been down for about an hour (Doc. No. 27, p. 11). The next day, June 26, 2009, another supervisor and Blanc issued Plaintiff a written warning, and Plaintiff stated something to the effect of, "This will not be good for me." When asked by Blanc what he meant, Plaintiff stated that he had received several prior warnings and that this one would probably result in his termination (Doc. Nos. 21, 27, p. 11). On June 29, 2009, Blanc informed Just of the circumstances that occurred, and management made the decision to terminate Plaintiff. Plaintiff received notice of his termination on June 30, 2009. *Id.*

## III. Standard of Review

Defendant is entitled to summary judgment if the affidavits, pleadings, and discovery materials show "there is no genuine issue as to any material fact and that the moving party is

---

[8]Each machine had a board where the operator could indicate that he had left early, was on break, was at lunch, or otherwise away from his post (Doc. No. 21, p.10).

entitled to judgment as a matter of law." *Allsup, Inc. v. Advantage 2000 Consultants, Inc.*, 428 F.3d 1135, 1138 (8th Cir. 2005); Fed. R. Civ. P. 56(a).  A genuine issue of fact is "material" if it might affect the outcome of the case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Once the moving party has met this burden, the non-moving party cannot simply rest on mere denials or allegations in the pleadings or simply create a factual dispute; "rather, the non-movant 'must set forth specific facts showing that there is a genuine issue for trial.'"  *Webb v. Lawrence County*, 144 F.3d 1131, 1135 (8th Cir. 1998) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  The Court views the facts in the light most favorable to the non-moving party and gives that party the benefit of all reasonable inferences which can be drawn from them—"that is, those inferences which may be drawn without resorting to speculation." *Mathes v. Furniture Brands Int'l, Inc.*, 266 F.3d 884, 885-886 (8th Cir. 2001) (citing *Sprenger v. Federal Home Loan Bank of Des Moines*, 253 F.3d 1106, 1110 (8th Cir. 2001)).

## IV.  Discussion

Plaintiff alleges retaliation claims under ERISA, FLSA, and ACRA.  In response to the summary judgment motion, he abandons all other claims (Doc. No. 26, p. 5).

1.  <u>Employee Retirement Income Security Act</u>

Section 510 of ERISA provides in part that

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter,

or the Welfare and Pension Plans Disclosure Act.  It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to this chapter or the Welfare and Pension Plans Disclosure Act.

29 U.S.C. § 1140.  The only portion of section 510 that Plaintiff indicates is applicable to him is the sentence barring the discharge of "any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to this chapter."  Plaintiff claims that Eaton terminated his employment because he participated "in a discussion regarding schedule changes, which would affect overtime, and fringe benefits like sick leave and the 401(k) retirement match," and he gave information in the form of testimony about his concerns with these changes (Doc. No. 26, p. 2-3).  Plaintiff argues the Court should find his comments or "conduct" to be protected activity under ERISA's anti-retaliation statute because they were solicited during a company meeting.  *Id.* at 3.

ERISA retaliation claims are analyzed using the same three prong analysis as employment discrimination cases.  *Rath v. Selection Research, Inc.*, 978 F.2d 1087, 1089 (8th Cir. 1992).  First, the Plaintiff must make out a prima facie case of retaliation.  *Id.*  To do so, the Plaintiff must show (1) he engaged in a statutorily protected activity; (2) the employer took an adverse employment action against him; and (3) a causal connection exists between the two.  *Id.* at 1090.  The proximity of two events can be sufficient to establish a prima facie case of retaliation, but proximity alone is often insufficient to ultimately prove pretext for the employer's legitimate, nondiscriminatory reason.  *Arraleh v. County of Ramsey*, 461 F.3d 967, 977 (8th Cir. 2006).  Once the Plaintiff has successfully shown a prima facie case, the burden of production shifts to the

Defendant to present a legitimate non-retaliatory reason for the adverse employment action. *Kinkead v. Southwesern Bell Tel. Co.*, 49 F.3d 454, 456 (8th Cir. 1995). Once the Defendant meets this burden, the burden then shifts back to the Plaintiff to show the Defendant's stated reason is pretext for retaliation. *Id.*

Here, Plaintiff has failed to make out a prima facie case of retaliation because he has not shown that he engaged in a statutorily protected activity. The evidence indicates that, on January 6, 2009, Plaintiff took part in a company team meeting. During that meeting, someone asked about holiday benefits the company usually offered, including an extra half-hour lunch and gift cards (Doc. No. 21-1, Exhibit B; Doc. No. 21-2, p. 26-27). Plaintiff thereafter asked if there were any more fringe benefits for employees. *Id.* Upon inquiry, Plaintiff stated that bad attitudes caused problems, and Eaton took this to mean that it was creating these bad attitudes (Doc. No. 21-1, Exhibit B). The employees were advised that the purpose of the meeting was not to discuss benefits, but to remove obstacles they faced on the production floor. Plaintiff was among those who received employer action for his conduct; he received a written warning for exhibiting behavior that was disruptive and impeded the team's focus. While Plaintiff recalls mentioning changes to the 401K plan, an admitted ERISA benefit, during this meeting, Eaton produced evidence that shows that notification of such a changes to the plan was made in February 2009, which was subsequent to the meeting (Doc. No. 21-1, Exhibit E, p. 22-23).

Further, there is no evidence Plaintiff had given information or had testified or was about to testify in any inquiry or proceeding. The Eighth Circuit has left open the question of whether § 510 protects informal complaints or protests relating to plan changes that a participant

reasonably believes to be illegal.  *Langlie v. Onan Corp.*, 192 F.3d 1137, 1141 (8th Cir. 1999).   For purposes of the instant summary judgment motion, the Court will assume, without so deciding, that ERISA § 510 provides a claim for such informal complaints and protests.   Plaintiff's evidence of a causal connection is the relatively short time between his comments during the team meeting on January 6, 2009, and his discharge on June 30, 2009.  This close temporal nexus gives rise to a reasonable inference of retaliatory motive.   However, establishing a prima facie case does not establish his ERISA § 510 claim.

Even if the Court were to find Plaintiff engaged in a protected activity and has established a prima facie case under ERISA § 510, Defendant has articulated a legitimate, non-discriminatory reason for Plaintiff's firing.   In support of its summary judgment, Eaton submitted deposition testimony of Edward Just asserting a legitimate, non-discriminatory reason for Plaintiff's discharge— poor work performance.  Also included is the improvement plan dated January 21, 2009, which outlined that Plaintiff's quality performance warranted termination, but that, due to his length of service and Eaton's hope that Plaintiff's attitude and performance could be turned around, the Termination Committee basically extended Plaintiff another opportunity to improve (Doc. No. 21-1, Exhibit D).  Those areas included: staying at his work station and focusing on his job; following the standard work and performing all prescribed quality checks; and constructively participating in team problem solving.  *Id.*  Plaintiff was advised that future corrective actions would result in his termination.  Plaintiff's last write-up from his relatively-new supervisor, Matteo Blanc, for being away from his work station, resulted in his termination as he had been warned.  In response to the motion, Plaintiff has failed

to set forth affirmative evidence that this reason is a pretext for interfering with his ERISA rights.

2.   <u>Fair Labor Standards Act</u>

The anti-retaliation provision of the FLSA makes it unlawful for any person

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceedings, or has served or is about to serve on an industry committee.

29 U.S.C. § 215(a)(3).  The United States Supreme Court recently held that the anti-retaliation provision of FLSA protects informal, oral complaints as well as written complaints of violation of the Act.  *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325 (Mar. 22, 2011); *see also Ritchie v. St. Louis Jewish Light*, 630 F.3d 713, 716 (8th Cir. 2011) (even if informal FLSA complaints were statutorily protected, employee failed to allege sufficient facts to indicate she even made an informal complaint).

In order to establish a prima facie case of retaliation under the FLSA, Plaintiff must show the same three prong analysis as employed above with his ERISA retaliation claim—that he participated in statutorily protected activity, that Eaton took an adverse employment action against him, and that there was a causal connection between his statutorily protected activity and the adverse employment action.  *See Ritchie v. St. Louis Jewish Light*, 630 F.3d at 717.  The Amended Complaint, Doc. No. 17, alleged that:

> 11.   Defendant retaliated against Plaintiff for exercising his rights under ERISA and complaining about violations of the FLSA in January of 2009.

12.     Accordingly, Plaintiff sues Defendant for retaliation and requests that he be reinstated to his job, and that he receive appropriate equitable relief, including, but not limited to, reinstatement and back pay under ERISA and the FLSA.

13.     Defendant's actions were willful, and Plaintiff is entitled to liquidated or punitive damages under the FLSA.  Plaintiff also requests pre-judgment interest.

Plaintiff presumably contends that his complaint about the elimination of the extended holiday lunch periods was a  FLSA complaint because "the elimination would have an effect on overtime" (Doc. No. 26, p. 3-4).  However, it is clear that meal times here were not work time, and there would have been no effect on overtime.  *See* 29 C.F.R. § 785.19(a) ("Bona fide meal periods are not worktime[.]") Further, there is no evidence that Plaintiff made any type of wage and hour complaint or that he thought he had engaged in any protected activity.  *See Saffels v. Rice*, 40 F.3d 1546, 1550 (8th Cir. 1994) (FLSA "protects employees who are discharged based on their employer's mistaken belief that they reported violations or otherwise engaged in protected activity.")  In fact, Plaintiff admits as much in his deposition testimony:

QUESTION:     But while you were at work at Eaton, do you ever remember complaining about the violation of the wage and hour laws?

PLAINTIFF:     No.

                                           ...

QUESTION:     I mean, did you ever have any questions about that [overtime] that you can recall when the supervisors filled out the timecards? Did you ever have any questions about the accuracy of your pay?

PLAINTIFF:     There might have been a time when there was a mistake made, but they usually corrected it.

13

(Doc. No. 26-1, p. 47-49).  Eaton is entitled to judgment as a matter of law as to Plaintiff's FLSA retaliation claim.

    3.  <u>Arkansas Civil Rights Act</u>

Plaintiff asserts a retaliation claim under the ACRA, stating that "since sick leave can be an accommodation, complaints about the elimination of sick leave easily fits into the definition of protected activity" (Doc. No. 26, p. 4-5).  Eaton continues to deny that it ever eliminated sick leave (Doc. No. 31, p. 4 n. 2).

To show a prima facie case of retaliation under the ACRA, Plaintiff again must show that (1) he engaged in protected activity, (2) he suffered an adverse employment action, and (3) there is a causal connection between the protected activity and the adverse action.  *See Burkhart v. American Railcar Indus. Inc.*, 603 F.3d 472, 477 (8th Cir. 2010).

The Eighth Circuit has held that when federal and state claims are joined and the federal claims are dismissed on a motion for summary judgment, the supplemental state claims "are ordinarily 'dismissed without prejudice to avoid [n]eedless decisions of state law ... as a matter of comity.'"  *American Civil Liberties Union v. City of Florissant*, 186 F.3d 1095, 1098-99 (8th Cir. 1999) (quoting *Birchem v. Knights of Columbus*, 116 F.3d 310, 314 (8th Cir. 1997)) (other citations omitted).  *See also Figg v. Russell*, 433 F.3d 593, 600 (8th Cir. 2006) (noting that when court dismissed federal 42 U.S.C. § 1983 action, it should have exercised its discretion to dismiss state-law claims without prejudice, leaving it to plaintiff to determine whether to reassert them in state court); *Johnson v. City of Shorewood, Minn.*, 360 F.3d 810, 819 (8th Cir. 2004) (district court has discretion to decline supplemental jurisdiction where it has dismissed all original jurisdiction

14

claims).  Accordingly, Plaintiff's state law ACRA claim will be dismissed without prejudice.

V.  Conclusion

For the foregoing reasons, the Court grants Eaton's motion for summary judgment on Plaintiff's ERISA and FLSA retaliation claims and dismisses his state law ACRA claim without prejudice.  An appropriate Judgment shall accompany this Memorandum and Order.

SO ORDERED this 20th day of January, 2012.

_____
UNITED STATES MAGISTRATE JUDGE